# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNA LISA PETERSON,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>        Defendant.<br>_____/ | CASE NO. 1:11-cv-00591-SMS<br><br>ORDER AFFIRMING AGENCY'S<br>DENIAL OF BENEFITS AND ORDERING<br>JUDGMENT FOR COMMISSIONER |

      Plaintiff Anna Lisa Peterson, by her attorneys, Christenson Law Firm, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge. Following review of the record as a whole and applicable law, this Court affirms the agency's determination to deny benefits to Plaintiff.

**I.**    <u>**Administrative Record**</u>

    **A.**    <u>**Procedural History**</u>

      Plaintiff was insured under the Act through December 31, 2011. On October 16, 2007, Plaintiff filed for disability insurance benefits, alleging disability beginning October 9, 2007. Her claim was initially denied on November 15, 2007, and upon reconsideration on June 13, 2008. Plaintiff appeared and testified at a hearing on October 5, 2009. On November 27, 2009,

1  Administrative Law Judge Michael J. Kopicki denied Plaintiff's application.  Plaintiff appealed to
2  the Administrative Council, which denied review on February 22, 2011.

3       **B.**     **Agency Record**

4       Plaintiff (born September 6, 1960) retired on medical disability from her prior work as a
5  dispatcher clerk at Porterville Developmental Center.  She had held the same job for fifteen years.
6  Plaintiff testified that, as a dispatcher clerk, she used the telephone to dispatch police, medical
7  services, ambulances, and other emergency care.  She responded to distress calls from the
8  Center's staff regarding client health emergencies and similar distress calls. She was also required
9  assist clients at her counter if they experienced physical or mental health crises, or had come to
10 express anger against Center administration.  As she dealt with these situations, Plaintiff's blood
11 pressure frequently became dangerously elevated.  Eventually, her cardiologist, Dr. Behl,
12 recommended that she retire from her position since the stress of the position was detrimental to
13 her health. On January 11, 2008, the California Public Employees' Retirement System approved
14 Plaintiff's application for disability retirement.   Since leaving the Center, Plaintiff's blood
15 pressure is "a lot more calm."  AR 35.

16      Plaintiff left her position when her employer proposed transferring her from the day shift
17 to the night shift.  In her Disability Report, Plaintiff stated that she could not accept the night shift
18 since she would have had to work alone, and that she "can't be alone due to [her] medical
19 condition."  AR 167.  At the hearing, however, Plaintiff testified that the proposed shift change
20 was irrelevant to her decision and that she would have then retired on disability even if she had
21 been slated to continue on the day shift.

22      Plaintiff has congestive heart failure which has been treated with an implanted pacemaker
23 and defibrillator to address her periodic arrythmias.  As Plaintiff begins to be stressed, she was
24 able to feel the device charging in preparation for a shock from the defibrillator.  If she was able to
25 calm down, the device did not deliver a shock.

26      She was also treated with multiple prescription medications: Amiodarone (heart function),
27 Lotrel (blood pressure), Thyroxine or Synthroid (thyroid), Digoxin (heart), Furosemide (diuretic),
28 Xanax (anxiety), Pristiq (depression), Ibuprofen (leg and foot pain), Carvedilol (heart), Naproxen

(leg and foot pain), and Soma (leg and foot pain).  Plaintiff reported many side effects including prickly hives, sensitivity to sun light, frequent urination, and the need to avoid grapefruit products.

Plaintiff testified that she was not permitted to lift more than ten pounds.  She could not stand more than an hour.  After walking a block, she became short of breath.  She could sit for a long time, but needed to move after about an hour and a half to avoid numbness in her legs.  In a typical day, Plaintiff rested for thirty minutes about four times.  She fatigued easily.  On some days, she lacked the energy to do anything at all.

Plaintiff completed high school and attended a psych-tech training program until her development of carpal tunnel syndrome rendered that occupation inappropriate.  She did not know how to type and had never learned to use a computer.  She was able to drive.

Plaintiff lived with her husband and an adult daughter.  On a typical day, she woke, washed up, ate a little breakfast, and took her pills.  She fed her dog.  She might straighten the living room, wipe off tables, vacuum,[1] or do a load of laundry.  Although she tried not to fix meals, she still did so.  Because of an inability to concentrate and carpal tunnel syndrome, she had given up her former hobbies of crocheting and sewing.  She liked reading but it put her to sleep.  Her memory was impaired.

Plaintiff attended church regularly.  She shopped twice a week with her husband, who would assist with heavy items.  Since family gatherings tired her, they were usually celebrated at her home.

**Carpal tunnel syndrome.**  Plaintiff's carpel tunnel syndrome was first identified in October 1991, after she had been employed as a food service worker at the Center for about ten years.  She was put on light duty work and began studying to be a psychiatric technician (psych-tech).  On January 20, 1994, orthopedist Mark L. Tindall, M.D., reported to the State Compensation Insurance Fund that Plaintiff's hand symptoms were increasing, exacerbated by her job as a student psych-tech.  Dr. Tyndall recommended that Plaintiff be reassigned as a psych-tech

---

[1] Plaintiff noted that she had to use care with household machinery since the electrical impulses generated by some appliances can induce arrythmias.

3

intern in an ambulatory unit.² In summer 1994, Plaintiff began to work full time as a psych-tech, which required significantly less use of her hands.  In October 1994, she began working as a telephone operator.

In January 1995, orthopedist Sergio D. Ilic, M.D., evaluated Plaintiff's occupational injuries.  Plaintiff complained of constant aching pain in both hands, aggravated by writing and housework.  She also experienced headaches and neck pain.  Plaintiff reported depression and stress at work, reporting that she was unhappy that she was not being assigned to work days.

**Dr. Wadhwani.**  Suneel Wadhwani, M.D., was Plaintiff's primary care physician.  His records reflect treatment of heart disease, minor injuries, allergies, and bronchitis.  Dr. Wadhwani noted that, after he prescribed Pristiq for Plaintiff's depression, she had more energy.

On September 16, 2009, Dr. Wadhwani completed a residual functional capacity questionnaire for Plaintiff's attorney.  Wadhwani diagnosed sleep apnea and congestive heart failure with fair prognosis.  Plaintiff experienced fatigue, depression, dizziness, and leg pain due to varicose veins.  Depression contributed to Plaintiff's symptoms and functional limitations.  Although she occasionally experienced pain, fatigue, or other symptoms severe enough to interfere with attention and concentration, Plaintiff could maintain attention for more than two hours at a time.  She was capable of low stress jobs.  Plaintiff could walk about four city blocks without rest or severe pain; could sit more than two hours; could stand 45 minutes at a time; could stand and walk four hours in an eight-hour workday; need not include periods of walking in her workday; needed to be able to change positions at will.  Plaintiff required four 30-minute breaks in an eight-hour workday.  She required no assistive device.  Plaintiff could never lift more than ten pounds and could lift less than ten pounds rarely; could frequently look down, turn head from right or left, look up, and hold head in static position; could never climb ladders or stairs; and could occasionally twist, stoop, and crouch.  Plaintiff could only use her hands and fingers to reach, handle, or finger for fifty percent of an eight-hour work day.

///

---

² The record does not explain why working as a psych-tech requires less use of the hands than training for the same position.

4

**Dr. Behl.**  Cardiologist Ashok Behl, M.D., monitored Plaintiff's cardiac health and her pacemaker beginning in 2001.  He diagnosed Plaintiff as having uncontrolled hypertension, chronic congestive heart failure, congestive cardiomyopathy, and hypothyroidism.

In a report dated January 5, 2001, Dr. Behl recounted that Jasvir Sidhu, M.D., had diagnosed Plaintiff with congestive cardiomyopathy in August 1997, after a syncopal spell led to her hospitalization.  Dr. Behl consulted with Dr. Sidhu, and concurred in the plan to treat Plaintiff conservatively with multiple medications.  Thereafter, Plaintiff improved.  Dr. Sidhu provided continuing care.  X-rays taken in March 1999 showed Plaintiff's heart to be of normal size without signs of heart failure or active lung process.  In late December 2000, Dr. Sidhu began treating Plaintiff for coughing and shortness of breath, which was first diagnosed as bronchitis.

Behl again treated Plaintiff on January 5, 2001, after Plaintiff experienced generalized convulsions in Dr. Sidhu's office and became unconscious.  Plaintiff was transferred to the Sierra View District Hospital emergency room, where she again had convulsions and was found to be in atrial fibrillation.  Plaintiff was treated in the cardiac intensive care unit.  Dr. Behl opined that if an acute coronary incident was ruled out, Plaintiff should be considered for an implantable ventricular defibrillator.

On January 8, 2001, Dr. Behl performed cardiac bypass surgery.  He continued to recommend implantation of a ventricular defibrillator.  By January 30, 2001, the defibrillator had been implanted.

On June 25, 2002, Dr. Behl provided a letter requesting that Plaintiff permanently be removed from jury duty due to her need to avoid stressful situations.

Behl's examinations of Plaintiff consistently found no anginal chest symptoms and fair breathing. Except for the examination on February 22, 2007, when she felt dizzy and faint, Plaintiff consistently denied any skipped beats, palpitation, dizziness, syncopal spell, or defibrillator shocks.  (On February 22, 2007, Plaintiff had not eaten breakfast.)  The doctor frequently noted high blood pressure.  Dr. Behl consistently recommended that Plaintiff stay on a low-salt, low-cholesterol, weight-reducing diet, but Plaintiff's weight stayed the same or increased

///

during her course of treatment, ranging from 172 to 184 pounds. (Plaintiff is five feet, five inches tall.)

On March 28, 2005, Plaintiff was seen in the emergency room after hearing a beeping sound from her defibrillator. The defibrillator again beeped on March 29, 2005. Behl suggested that the defibrillator had been unable to check the atrial lead impedance. On June 27, 2005, Plaintiff was treated in the emergency room after being shocked by the defibrillator. Dr. Behl performed surgery to replace the generator on January 11, 2006.

On October 12, 2007, Dr. Behl wrote the following letter "To whom it may concern":

> [Plaintiff] is a patient of mine with, hypothyroidism, hypertension, congestive cardiomyopathy, AICD implantation for ventricular disarrythmia and congestive heart failure.
>
> She has tried to carry her current shift and her symptoms have not been well controlled for her medical condition, due to these circumstances she will be permanently medically disabled.

AR 383.

On October 28, 2007, Dr. Behl completed a Physician's Report on Disability required as part of Plaintiff's application for disability retirement from her position at the Center. He reported Plaintiff's subjective complaints as exertional fatigue and dyspnea, and diagnosed chronic cardiomyopathy, chronic hypertension, and UICD implantation for malignant vesticular [*illegible*]. In response to the request to provide specific work activities that Plaintiff was unable to perform, Behl responded, "Patient unable to perform duties. Plaintiff permanently disabled." AR 435.

On September 15, 2008, following a cardiac echodoppler study, Behl concluded: "Mild concentric left ventricular hypertrophy. Mild tricuspid regurgitation. Trace mitral regurgitation. Mild left atrial enlargement." AR 402.

According to radiologist Edgard Couri, M.D., chest x-rays administered August 1, 2008, on Behl's order revealed:

> There is mild left ventricular cardiac enlargement. No [congestive heart failure]. No pulmonary vascular congestion. No infiltrates. No pleural effusion. Dual-chamber pacemaker in good position.

AR 391.

6

**Dr. Marmalejo.** A podiatrist, Dr. Marmalejo initially treated Plaintiff for a right foot injury, then addressed severe pain in her left heel, which he diagnosed at plantar fasciitis. Dr. Marmalejo treated Plaintiff with steroid injections and a cast.

**Dr. Warner.** On June 17, 2009, Gregory Warner, M.D., performed a full polysomnography and diagnosed Plaintiff with mild sleep apnea. Warner recommended a CPAP machine and weight loss.

**Dr. Fast.** Roger D. Fast, M.D., prepared a physical residual capacity assessment on behalf of the agency. He opined that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently; could stand or walk six hours in an eight hour work day; could sit about six hours in an eight-hour work day and had unlimited ability to push and pull. Plaintiff had no postural or environmental limitations except that she should never climb ladders, ropes, or scaffolds. Fast explained:

> This claimant has a history of cardiomyopathy with ventricular dysrhythmia and had an AICD implanted in 2001. The generator was replaced in 2006. Claimant has done well and her last echo[cardiogram] in 08/07 showed an EF of 57% with only mild EVH. Her only exam after AOD is quite normal and she has not had any cardiac symptoms. Due to the possibility of her AICD firing, she should be restricted from heights and ladders. With no recent CHF and only mild LVH, she can do medium exertion.

AR 236.

**Dr. Middleton.** Psychologist Allen H. Middleton, Ph.D., prepared the psychiatric review technique for the agency. He opined that Plaintiff had anxiety and affective disorders that were not severe.

**Vocational expert.** Judith Najarian testified as the vocational expert. She explained that Plaintiff's prior work as a dispatcher clerk encompassed four different types of jobs included in the DOT: telephone operator (sedentary, SVP 3, semiskilled), radio dispatcher (sedentary, SVP 4, semi-skilled), emergency response dispatcher (sedentary SVP 6, semiskilled), and surveillance monitor (sedentary, SVP 2).

For the first hypothetical question, the ALJ directed Najarian to assume an individual aged 47 to 49 years with a high school education and the same work experience as that Najarian had described for Plaintiff. The individual retained the residual functional capacity for medium work,

7

that is, he or she could lift or carry fifty pounds occasionally and twenty-five pounds frequently; could stand or walk six hours in an eight-hour work day; could sit about six hours in an eight-hour workday; should never climb ladders, ropes, or scaffolds; and should avoid even moderate exposure to hazards such as dangerous machinery or unprotected heights. Najarian testified that such a person could perform Plaintiff's prior work.

For the second hypothetical question, the ALJ directed Najarian to assume that the individual was limited to sedentary work, that is, he or she could lift or carry ten pounds occasionally and five pounds frequently; could stand or walk for two hours in and eight-hour work day; could sit about six hours in and eight-hour work day; should never climb ladders, ropes, or scaffolds; and should avoid even moderate exposure to moving machinery and unprotected heights. The individual was also limited to low stress work, which should be defined as not requiring multitasking, dealing with clients on a face-to-face basis, or responding to emergency situations in the ordinary course of job duties. Najarian opined that such a person could not perform Plaintiff's prior work but could perform other sedentary unskilled positions. One such job was suture measurer (DOT No. 712.687-018) with 1307 positions in California(including a 15% reduction to eliminate those positions that would require work on a conveyor belt). Other positions included cuff folder (DOT No. 685.687-014) with 5615 positions in California and buckle wire inserter (DOT No. 734.687-034) with 2371 positions in California. In addition, Najarian testified that Plaintiff's existing skills would transfer to telephone answering service (DOT No. 235.662-026, sedentary, SVP 3), 5327 jobs in California; telephone solicitor (DOT No. 299.357-014, sedentary, SVP 3), 25,372 positions in California. In each case, said Najarian, about nine times as many positions were available nationally.

Plaintiff's counsel then directed Najarian to assume an individual of the same age, education, and work experience as Plaintiff, who was limited to using their hands, arms, and fingers, bilaterally, to fifty percent of the work day. Najarian responded that such a person could not perform Plaintiff's prior work or any other work in the national economy.

///

///

## II. Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

Step one:   Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two:   Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four:  Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five:  Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of October 9, 2007. Her severe impairments were congestive cardiomyopathy with Medtronic defibrillator implant in situ, plantar fasciitis, and obesity.

Plaintiff retained the residual functional capacity to lift and carry ten pounds occasionally and five pounds frequently, and to stand or walk two hours and to sit six hours in an 8-hour work day. She could never climb ladders, ropes, or scaffolds, and must avoid even moderate exposure

to dangerous machinery and unprotected heights.  Plaintiff is limited to low stress work, defined as work that does not require multitasking, dealing with clients, or responding to emergency situations.  Although Plaintiff is unable to perform her past relevant work, she retains multiple work skills that are transferable to other jobs that exist in significant number in the national economy.

### III.  Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

### IV.  Plaintiff's Credibility

Plaintiff contends that the ALJ erred in finding Plaintiff not credible.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991).  *See also Bunnell v. Sullivan*, 947 F.2d 341,

346 (9th Cir. 1991).  "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th

Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

In the hearing decision, the ALJ discussed in detail inconsistencies between Plaintiff's subjective complaints and the corresponding objective evidence.[3]

> **The claimant testified that she stopped working in October 2007 because she had high blood pressure and heart failure and her cardiologist told her to stop working because her job was too stressful, but she denied that she stopped working because she was to be put on night shifts.**
>
>   AR 14.

In her initial application, Plaintiff explained her decision to leave her job by stating that because she could not be alone with her condition, she could not work night shifts. That statement was consistent with her earlier complaint to Dr. Ilic that she was unhappy when she was not permitted to work days. In her testimony, Plaintiff denied that the shift to night work had anything to do with her decision to seek disability retirement.

Nothing else in the record explains why, after continuing to work after implantation of the pacemaker in 2001 and after the replacement of the generator in January 2006, Plaintiff elected to retire in October 2007. In his October 12, 2007 letter declaring Plaintiff permanently disabled, Dr. Behl attributed Plaintiff's disability to her inability to "carry her current shift." AR 383. In the absence of any other source for this information, his conclusion could only have been based on Plaintiff's own subjective reports and may have been intended to reflect no more than Plaintiff's subjective dislike of working the night shift.[4]

> **The claimant testified that she still gets arrythmias and is under a lot of stress due to pain, and that any stress causes heart flutter and hypertension, however, the medical evidence shows that she denies skipped beats or**

---

[3] Citations to the agency record have been omitted in each of the following quotations from the hearing decision.

[4] Plaintiff's claim that her condition precluded her being alone is curious in light of her testimony that, since both her husband and adult daughter worked full time, her days at home were generally spent alone.

12

> **palpitations, and has not reported any heart symptoms to her cardiologist Dr. Behl. Furthermore, the claimant's blood pressure was most recently recorded at 150/80 when she was medically cleared for gynecological surgery by Dr. Behl. The claimant testified that she had chest pain and dizziness depending on what as he was about to do; however, she has not reported chest pain or dizziness to her cardiologist.**

**AR 14-15.**

This paragraph speaks for itself. Although Plaintiff saw Dr. Behl numerous times between 2001 and 2009, the only occasion on which she did not deny experiencing skipped beats, palpitation, dizziness, syncopal spell, or defibrillator shocks was February 22, 2007, when she felt dizzy and faint but explained that she had skipped breakfast.

> **The claimant testified that she has problems with her feet and cannot stand in the morning. She is scheduled for surgery on varicose veins in 6 weeks according to her testimony. The record shows that she has been treated for restless leg syndrome with Requip with good results. The claimant has also been treated for plantar fasciitis on her left foot with a WB BK cast in September 2008. The claimant's cardiology examinations have excluded the presence of edema in her lower extremities.**

**AR 15.**

Elsewhere in the hearing decision, the ALJ observed that Plaintiff demonstrated no limitations in activities of daily living. Plaintiff testified that she drove, performed light housekeeping, cooked, fed her dog, and did laundry. She shopped twice a week and attended church. She could stand an hour. She testified that she could not walk more than a block due to shortness of breath, not due to leg or foot problems.

> **The claimant testified that stress makes her heart flutter, but since her initial cardiac diagnoses, the claimant's symptoms have been stable and she consistently denied palpitations, skipped beats, and chest pain or defibrillator shocks. There is evidence that since her initial defibrillator implantation she has had one episode of defibrillator shock for ventricular fibrillation on June 28, 2005, when she also reported that she had no complaints of chest pain, skipped beats or palpitations, dizziness or syncopal episodes prior to the defibrillator shock.**

**AR 15.**

As previously discussed, Plaintiff consistently denied palpitations, skipped beats, and chest pain or defibrillator shocks. The record includes only the single episode of defibrillator shock, the likelihood of which logically flows from the decision to implant a defibrillator in the first place. Again, as the ALJ observed in the hearing decision, following implantation of the

defibrillator and pacemaker to address Plaintiff's cardiac problems, Plaintiff was able to perform her job without any documented problems until October 2007, when she coincidentally was also to be transferred to night work.

After setting forth his reasons for concluding that Plaintiff's testimony was not fully credible, the ALJ proceeded to analyze in detail the medical evidence included within the agency record. His detailed discussion sets forth the substantial evidence supporting his determination.

### V.     Opinions of Treating Physicians

Plaintiff contends that the ALJ erred in failing to adopt the opinions of Plaintiff's residual functional capacity rendered by her treating physicians, Dr. Behl and Dr. Wadhwani.

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S. S. R. 96-5p. The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id.* The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague*, 812 F.2d at 1230. Nonetheless, a treating physician's opinion is not conclusive

14

as to either a physical condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

### A.     Dr. Behl

Plaintiff contends that the ALJ erred in failing to adopt the October 28, 2007 Physicians Report on Disability in which Behl declared Plaintiff permanently disabled under the California Public Employees Retirement Law.  The ALJ wrote, "I have assigned little weight to Dr. Behl's opinion that the claimant is permanently disabled because he does not provide a basis for excluding all work and further more the issue of disability is reserved to the Commissioner."  AR 16.

Considering that Dr. Behl responded to a question requesting specific examples of work activities that Plaintiff was unable to perform with a general statement that Plaintiff was unable to perform her duties, little basis exists to debate the ALJ's conclusion that Dr. Behl offered no basis for excluding Plaintiff from all work.  Indeed, the questionnaire concerned only Plaintiff's job as dispatcher clerk and required Dr. Behl to confirm that he had reviewed the requirements of that job. In addition, another agency's determination that an individual is disabled or blind does not bind the Commissioner.  20 C.F.R. § 404.1504.

Finally, as the Commissioner contends, Dr. Behl's conclusory opinion did not bind the ALJ.   An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); Social Security Ruling 96-5p. "Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

Plaintiff argues that evidence in the record supported Dr. Behl's opinion.  But the Court must evaluate whether substantial evidence supported the ALJ's determination.  Since substantial evidence and applicable law supported the ALJ's determination to reject Dr. Behl's opinion, this Court may not overturn it.

///

///

### B. Dr. Wadhwani

Again arguing that the medical records support the opinions, Plaintiff contends that the ALJ erred in failing to adopt treating physician Dr. Wadhwani's opinions, as expressed on the residual functional capacity questionnaire. The Commissioner responds that the ALJ properly explained why he gave little weight to Dr. Wadhwani's opinion.

The ALJ wrote:

> Little weight is assigned to the opinion of Dr. Wadhwani who opined that the claimant would need to take unscheduled work breaks 4 times per day for thirty minutes, and who indicated the claimant suffered from fatigue due to sleep apnea. The sleep apnea was evaluated by Dr. Warner, determined to be "mild," and is treated with a CPAP. Furthermore, Dr. Wadhwani listed the claimant's symptoms as fatigue, depression and dizziness while the record shows the claimant denied syncope or dizziness repeatedly when seen by Dr. Behl. Dr. Wadhwani also opined the claimant had significant limitations with repetitive reaching, handling and fingering. The medical record shows that the claimant was diagnosed with carpal tunnel syndrome in 1994, but she has not offered any complaints related to carpal tunnel syndrome since that time.

AR 16 (*citations to record omitted*).

Dr. Wadhwani's opinion is generally consistent with the Commissioner's determination that Plaintiff was capable of sedentary work. As fully discussed in the review of the agency record, Dr. Wadhwani identified Plaintiff severe medical conditions as sleep apnea and congestive heart failure with fair prognosis. Dr. Wadhwani described Plaintiff as a fairly capable individual who could maintain attention for more than two hours at a time, perform low stress jobs, walk about four city blocks without rest or severe pain, sit more than two hours, stand 45 minutes at a time, could stand and walk four hours in an eight-hour workday, did not need to include periods of walking in her workday, but needed to be able to change positions at will. She could never lift more than ten pounds and could lift less than ten pounds rarely; could frequently look down, turn head from right or left, look up, and hold her head in static position; and could occasionally twist, stoop, and crouch. She should never climb ladders or stairs. She required no assistive device.

To the extent that Dr. Wadhwani's opinion was predicated on symptoms of dizziness, however, it is unsupported by the medical record, which revealed, as fully discussed above, that Plaintiff consistently denied experiencing dizziness or syncopal symptoms.

///

Two portions of Dr. Wadhwani's opinion require further comment.  First, Dr. Wadhwani opined that Plaintiff required four 30-minute breaks in an eight-hour workday, attributing Plaintiff's fatigue to sleep apnea.  His conclusion was inconsistent with objective medical evidence in the record since sleep specialist Dr. Warner, to whom Dr. Wadhwani had referred Plaintiff, diagnosed mild sleep apnea that could be successfully treated with CPAP and weight loss.  In short, Dr. Wadhwani's opinion was contradicted by his own consultant.

Dr. Wadhwani also opined that Plaintiff could only use her hands and fingers to reach, handle, or finger for fifty percent of an eight-hour work day.  The record includes no objective basis for this degree of limitation, but indicates that Plaintiff developed bilateral carpal tunnel syndrome in the early 1990's.  Dr. Ilic declared Plaintiff's carpal tunnel syndrom permanent and stationary in 1995 at about the same time that her former employer transferred Plaintiff to her former position as dispatcher clerk.  Plaintiff successfully held that position for the next fifteen years and does not claim that her 1996 departure related in any way to the limitations of her hands.  Nor does the record included any record of any further treatment or any change in the condition of Plaintiff's carpal tunnel syndrome after 1995.  Accordingly, in this regard, Dr. Wadhwani's opinion is unsupported by any objective medical evidence.

**VI.   Conclusion and Order**

The ALJ's conclusions were supported by substantial credible evidence.  Accordingly, this Court hereby AFFIRMS the agency's determination to deny Plaintiff disability benefits.  The Clerk of Court is directed to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:   July 3, 2012**                                    /s/ Sandra M. Snyder
                                                                              UNITED STATES MAGISTRATE JUDGE